## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO. _____** |
| | : | |
| **Plaintiff,** | : | **VIOLATIONS:  18 U.S.C. § 371;** |
| | : | **18 U.S.C. § 1343; 15 U.S.C. §§** |
| | : | **78m(b)(2)(A), 78m(b)(5), 78 ff(a);** |
| | : | **18 U.S.C. § 2.** |
| **v.** | : | |
| | : | |
| **YORK INTERNATIONAL** | : | |
| **CORPORATION,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## INFORMATION

The United States Department of Justice, Criminal Division, Fraud Section, charges that:

## GENERAL ALLEGATIONS

1.      At all times material to this Information (unless specified otherwise):

   York International Corporation Entities, Employees, and Agent

2.      YORK INTERNATIONAL CORPORATION ("YORK") was a global

supplier of heating, ventilation, air-conditioning, and refrigeration equipment and services.

YORK was headquartered in York, Pennsylvania, and maintained operations through

subsidiaries in various foreign countries, including the United Arab Emirates ("UAE"), the Arab

Republic of Egypt ("Egypt"), the Kingdom of Bahrain ("Bahrain"), the Republic of Turkey

("Turkey"), and the Republic of India ("India").

3.      YORK, a Delaware corporation, was publicly traded on the New York Stock

Exchange.  It issued and maintained a class of publicly-traded securities registered pursuant to

Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), and was required to file

periodic reports with the United States Securities and Exchange Commission under Section 13 of

the Securities Exchange Act (15 U.S.C. § 78m).  Accordingly, YORK was an "issuer" within the

meaning of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1(a).  By virtue of its

status as an issuer within the meaning of the FCPA, YORK was required, pursuant to 15 U.S.C.

§ 78m(b)(2), to make and keep books, records and accounts which, in reasonable detail,

accurately and fairly reflected the transactions and disposition of assets of YORK and to ensure

that its wholly-owned subsidiaries maintained accurate books and records.

4.      YORK maintained a wholly-owned subsidiary under the name of York Air

Conditioning and Refrigeration, Inc. ("YACR"), which was organized under the laws of the State

of Delaware and which maintained a branch office in Dubai, UAE.  Accordingly, YACR was a

"domestic concern" within the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(1)(B).  YACR's

Dubai office served as the headquarters of YORK's Middle East operations and employed the

YORK representatives who authorized and approved kickbacks to the government of Iraq.

5.      YACR maintained a wholly-owned subsidiary under the name York Air

Conditioning and Refrigeration FZE ("FZE"), which was also headquartered in Dubai and was

the entity through which YORK conducted business in Iraq.

6.      "Employee A," a citizen of the United Kingdom, was Vice President and General

Manager of YACR.

7.      "Employee B," a citizen of the Syrian Arab Republic, was a Sales Manager of

YACR and was responsible for managing FZE's contracts with the Iraqi government.

2

8.    "Company X," a consulting company based in Jordan, was a sales agent for FZE in the Middle East region.

Overview of the Kickback and Bribery Schemes

9.    FZE's Kickback Payments to the Iraqi Government.  From in or about November 2000 through March 2003, FZE paid approximately $647,000 in kickbacks to the government of the Republic of Iraq ("Iraq") in return for the award of Iraqi government contracts, administered through the United Nations Oil-for-Food Program ("OFFP"), with a total contract value of approximately $7 million.  The kickbacks were authorized by Employees A and B, and were paid to the government of Iraq through Company X.  FZE concealed the kickbacks from the U.N. by inflating its contract prices by 10% before submitting the contracts for approval.  YORK and FZE also disguised the payments on their own corporate books and records by describing them as "commission" and "consultancy" payments.

10.    YACR and FZE's Kickback and Bribe Payments in Other Countries.  From in or about September 1999 through December 2005, YACR and FZE, conspiring with others, known and unknown, authorized hundreds of kickbacks and bribes to employees of government customers and contractors of government customers in order to obtain approximately $42 million in contracts on governmental projects in Bahrain, Egypt, India, Turkey, and UAE.  These kickbacks and bribes were primarily facilitated through contractors, who generated and submitted false invoices to YACR and FZE for consulting services that they had not performed.  When YACR and FZE paid the contractors the fees for purported consulting services, the contractors gave cash back to YACR and FZE salespeople, who used the cash to pay the kickbacks and bribes.

3

Background: The United Nations Oil-for-Food Program

11.     On or about August 6, 1990, days after Iraq's invasion of Kuwait, the U.N. adopted Security Council Resolution 661, which prohibited U.N. member-states from transacting business with Iraq, except for the purchase and sale of humanitarian supplies.  Resolution 661 prohibited all direct financial transactions with the government of Iraq.

12.     On or about April 15, 1995, the U.N. adopted Security Council Resolution 986, which served as a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its oil.  However,  Resolution 986 required that the proceeds of oil sales be used by the Iraqi government to purchase humanitarian supplies, including food, for the Iraqi people.  Hence, this program became known as the Oil for Food Program.  Payments made to the Iraqi government which were not approved by the U.N., and which were outside the strict contours of the OFFP, were prohibited.

13.     The OFFP required that the proceeds from all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas").  That escrow account funded the purchase of humanitarian goods by the Iraqi government.

14.     Under the provisions of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the Iraqi government.  Once that contract was finalized, the contract was submitted to a U.N. Committee  ("the 661 Committee") which reviewed the contracts  to ensure that their terms complied with all UN OFFP and Iraqi sanction regulations.  The 661 Committee accepted the contracts, rejected them,

4

or asked the supplier to provide additional information upon which the committee could make a decision.

15.     If a contract was approved by the 661 Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were determined by the OFFP to have been met, the OFFP would direct BNP-Paribas to release payment to the supplier.

16.     On or about December 10, 1996, the first Iraqi oil exports under the U.N. OFFP began. The OFFP continued from in or about December 1996 until the United States' invasion of Iraq on or about March 19, 2003. From in or about December 1996 through March 2003, the United States government prohibited United States companies and individuals from engaging in transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the OFFP. 31 C.F.R. § 575.201, *et. seq.*

17.     Beginning in approximately August 2000, the Iraqi government demanded that the suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government. These kickbacks violated U.N. OFFP regulations and U.N. sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by OFFP guidelines.

18.     Often these kickbacks were termed "after sales service fees" ("ASSFs"). They did not, however, involve the performance of any actual service by the supplier. These ASSFs

were usually included in the contract price submitted by the supplier to the U.N. without

disclosing to the U.N. the fact that the contract contained an extra 10% which would be kicked

back to the Iraqi government. Including the 10% in the contract price allowed the supplier to

avoid paying the 10% out of its profits; instead, the suppliers caused the UN to fund the

kickbacks to the Iraqi government.

19.     Some suppliers labeled the ASSFs as such in the contracts submitted to the U.N.

for approval, thereby leading the U.N. to believe that actual after-sales services were being

provided by the supplier. Other suppliers disguised the ASSFs by inserting fictitious line items

into the contracts for goods or services that were not being provided. Still other suppliers simply

inflated their contract prices by 10% to account for the payments they would make, or cause to be

made, to the Iraqi government.

## COUNT ONE
### (Conspiracy)

### THE CONSPIRACY AND ITS OBJECTS

20.     Paragraphs 1 through 19 of this Information are realleged and incorporated

by reference as if set out in full.

21.     From in or about September 1999 through December 2005, within the territory of

the United States and elsewhere, defendant YORK, and others, known and unknown, did

unlawfully and knowingly combine, conspire, confederate and agree together and with each other

to commit the following offenses against the United States:

a.     to knowingly devise, and intend to devise a scheme and artifice to defraud

the United Nations and the Oil-for-Food Program and to obtain money and property by means of

6

materially false and fraudulent pretenses, representations and promises, through the use of

interstate and foreign wire communications, in violation of 18 U.S.C. § 1343; and

      b.     to knowingly falsify and cause to be falsified books, records, and accounts

which, in reasonable detail, would accurately and fairly reflect the transactions and dispositions

of the assets of YORK, an issuer within the meaning of the FCPA, in violation of  15 U.S.C. §§

78m(b)(2)(A), 78m(b)(5) and 78ff(a).

PURPOSE OF THE CONSPIRACY

22.     The primary purpose of the conspiracy was to pay unlawful kickbacks to the Iraqi

government and to make other improper payments to officials of other governments in order to

assist in obtaining and retaining business from and with those governments.

MANNER AND MEANS OF THE CONSPIRACY

23.     To achieve the purpose of the conspiracy, YORK, through its wholly-owned

subsidiaries FZE and YACR, and others, used the following manner and means, among others:

      a.     It was part of the conspiracy that FZE agreed to cause money to be sent

to bank accounts controlled by the government of Iraq in exchange for being granted contracts

with the government.

      b.     It was a further part of the conspiracy that FZE inflated by 10% the prices

of contracts submitted to the U.N. for approval under the OFFP, without notifying the U.N. of

this price inflation,  in order to generate the money that would be paid to the government of Iraq

and to conceal from the U.N. the fact that money would be paid to the government of Iraq.

      c.     It was a further part of the conspiracy that FZE caused the transmission of

international wire communications to advise the U.N. OFFP that FZE goods had been shipped to,

7

and inspected in, Iraq, and to transmit notice to FZE's bank in Dubai that the U.N. was
authorizing payments pursuant to the contracts.

      d.      It was a further part of the conspiracy that YACR and FZE authorized the
making of improper payments to government officials in UAE, Egypt, Bahrain, Turkey, and
India, in order to assist in obtaining and retaining business on government projects in those
countries.

      e.      It was a further part of the conspiracy that YACR and FZE hired third-
party consultants and agents for the purpose of facilitating and concealing the kickbacks and
bribes.

      f.      If was a further part of the conspiracy that YORK falsely described the
kickbacks paid to the Iraqi government and to government officials in Bahrain, Egypt, India,
Turkey, and UAE in its corporate books and records, terming the payments "commission" and
"consultancy" payments, when in truth and in fact, the payments generated cash which was used
to pay bribes and kickbacks to foreign governments and officials.

<strong><u>OVERT ACTS</u></strong>

    24.      In furtherance of the conspiracy and to accomplish its unlawful objects, the
following overt acts, among others, were committed within the territory of the United States and
elsewhere:

<u>OFFP Kickbacks to the Iraqi Government</u>

    25.      In or about March 1999, FZE retained Company X for the purpose of
obtaining contracts with the government of Iraq, pursuant to the OFFP.

8

26.    On or about November 1, 2000, FZE submitted a bid to supply air compressors to the Iraqi Ministry of Trade and was told by an Iraqi ministry official that in order to obtain the contract, FZE must pay a kickback to the Iraqi government in the amount of 10% of the total contract price.

27.    On or about November 19, 2000, Employees A and B met with a representative of Company X to discuss FZE's bid to obtain the Iraqi compressor contract, and agreed to pay the requested kickback to the Iraqi government by inflating the amount of money paid to Company X by the amount of the requested kickback, and then having Company X pay that additional amount into bank accounts controlled by the Iraqi government.

28.    On or about November 29, 2000, FZE was awarded a contract to supply air compressors to the Iraqi Ministry of Trade, with a total contract price of $1,236,379. This contract, which was referenced by the U.N. as Contract H_801559, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

29.    On or about November 29, 2000, at FZE's direction, Company X paid a kickback of approximately $109,911 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_801559.

30.    On or about February 27, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 1,328,736 Euros from the OFFP

escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract H_801559.

31.    On or about December 21, 2000, FZE was awarded a contract to supply spare parts to the Iraqi Ministry of Health, with a total contract price of $1,669,457. This contract, which was referenced by the U.N. as Contract H_801608, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

32.    On or about December 21, 2000, at FZE's direction, Company X paid a kickback of approximately $146,267 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_801608.

33.    On or about October 17, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 1,816,369 Euros from the OFFP escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract H_801608.

34.    On or about May 15, 2001, FZE was awarded a contract to supply air conditioners to the Iraqi Ministry of Trade, with a total contract price of $464,488. This contract, which was referenced by the U.N. as Contract H_900834, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

10

35.    On or about May 15, 2001, at FZE's direction, Company X paid a kickback of approximately $32,482 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_900834.

36.    On or about October 11, 2002, the New York branch of BNP-Paribas sent, via an international electronic wire communication a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 530,690.36 Euros from the OFFP escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract H_900834.

37.    On or about May 19, 2001, FZE was awarded a contract to supply spare parts to the Iraqi Ministry of Transport and Communications, with a total contract price of $231,522. This contract, which was referenced by the U.N. as Contract H_900835, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

38.    On or about May 19, 2001, Company X paid a kickback of approximately $22,277 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_900835.

39.    On or about September 27, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 270,186 Euros from the OFFP escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract H_900835.

40.     On or about May 30, 2001, FZE was awarded a contract to supply air-cooled package units to the Iraqi Ministry of Transport and Communications, with a total contract price of $40,279. This contract, which was referenced by the U.N. as Contract H_901296, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

41.     On or about May 30, 2001, at FZE's direction, Company X paid a kickback of approximately $3,923 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_901296.

42.     On or about May 23, 2002, a company based in Geneva, Switzerland that provided commercial inspection services on behalf of the U.N. in Iraq ("the inspection company"), sent from Iraq to the U.N. in New York, via international wire communication, verification that YORK products purchased pursuant to Contract H_901296 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to YORK for Contract H_901296.

43.     On or about July 24, 2001, FZE was awarded a contract to supply air conditioners and spare parts to the Iraqi Ministry of Higher Education and Scientific Research, with a total contract price of $3,232,323. This contract, which was referenced by the U.N. as Contract H_1100131, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

12

44.     On or about July 24, 2001, at FZE's direction, Company X paid a kickback of $332,250 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_1100131.

45.     On or about November 1,  December 1,  December 7 and December 8,  2002, the inspection company sent from Iraq to the U.N. in New York, via international wire communications, verification that YORK products purchased pursuant to Contract H_1100131 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to YORK for Contract H_1100131.

46.     In order to conceal the kickback payments to the Iraqi government on its corporate books and records, YORK and FZE improperly characterized the payments to the Iraqi government as "commission" and "consultancy" payments  to Company X.

### Other Improper Payments

47.     From in or about September 1999 through December 2005, YACR and FZE authorized hundreds of improper payments to employees of government customers and contractors of government customers in order to assist in obtaining and retaining business on government projects in Bahrain, Egypt, India, Turkey and UAE.  These kickbacks and bribes were primarily facilitated through contractors, who generated and submitted false invoices to YACR and FZE for consulting services that they had not performed.  When YACR and FZE paid the fees for the purported consulting services, the contractors gave cash to YACR and  FZE salespeople, who used the cash to pay the kickbacks and bribes.

48.     In one case, YACR authorized the payment of kickbacks in connection with its work for a luxury hotel and convention complex in Abu Dhabi, UAE, as follows:

13

a.      In or about 2003 and 2004, YACR was awarded several contracts worth a total of approximately $3.7 million to supply air conditioning goods and services for a luxury hotel and convention complex built and owned by the government of Abu Dhabi, UAE. In exchange for its receipt of the hotel and convention complex contracts, from in or about March 2003 through April 2004, YACR, through Employee B, made thirteen payments totaling approximately $550,000 to an intermediary in circumstances that make it likely that the intermediary made corrupt payments to members of the hotel and convention complex's executive committee, which was established by UAE government decree and which represented UAE's Ministry of Finance and Industry in managing the construction of the complex.

(All in violation of Title 18, United States Code, Section 371).

## COUNT TWO
### (Wire Fraud)

49.      Paragraphs 1 though 19 and 25 through 47 are realleged and incorporated as if fully set forth herein.

50.      From approximately November 2000 through March 2003, within the territory of the United States and elsewhere, defendant YORK, acting through its wholly-owned subsidiary FZE, unlawfully, willfully and knowingly having devised a scheme and artifice to defraud and obtain money from the U.N. and the OFFP by means of false and fraudulent pretenses, representations and promises, caused the transmission of writings, signs and signals, by means of wire communication in interstate and foreign commerce, for the purpose of executing such scheme and artifice, to wit:

a.    FZE caused international wire communications to be transmitted by BNP Paribas in New York, New York, to ABN Amro Bank N.V. located in Dubai, UAE, thereby authorizing the eventual payment by the U.N. to YORK for humanitarian goods supplied to the Iraqi government; and

b.    FZE caused international wire communications to be transmitted by an inspection company in Iraq to the U.N. in New York, New York, informing the U.N. that humanitarian goods supplied by FZE had been received and inspected by the inspection company in Iraq, thereby triggering payment for those goods to FZE by the U.N. OFFP.

(All in violation of Title 18, United States Code, Sections 1343 and 2).

### COUNT THREE
### (Books and Records)

51.    Paragraphs 1 through 19 and 25 through 47 are realleged and incorporated as if fully set forth herein.

52.    Defendant YORK, by virtue of its status as an "issuer" within the meaning of the Securities and Exchange Act of 1934, was required to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets of YORK.

53.    From in our about September 1999 through in or about December 2005, within the territory of the United States and elsewhere, defendant YORK knowingly falsified the books, records and accounts it was required to maintain under the Securities and Exchange Act of 1934 in that:

a.    YORK inaccurately reflected in its books and records the payments to Company X as "commission" and "consultancy" payments when in fact, as YORK understood, a portion of those payments were unlawful kickbacks to the Iraqi government, paid through Company X;  and

b.    YORK inaccurately reflected in its books and records the payments in Bahrain, Egypt, India, Turkey, and UAE as "commission" and "consultancy" payments when, in fact, as YORK understood, those payments were used to generate cash which was used to pay kickbacks and bribes.

(All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff(a) and Title 18, United States Code, Section 2).


STEVEN A. TYRRELL
Chief, Fraud Section
Criminal Division
United States Department of Justice


By: _____

Mark F. Mendelsohn
Deputy Chief, Fraud Section

William B. Jacobson
Robertson Park
Assistant Chiefs, Fraud Section

Hank Bond Walther
Trial Attorney, Fraud Section


16