# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | NO. 07-CR-00253 |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| YORK INTERNATIONAL CORPORATION., | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

## NOTICE

The United States Department of Justice, Criminal Division, Fraud Section ("the Department"), hereby serves notice of the filing of the Deferred Prosecution Agreement entered into between the Department and York International Corporation and attached hereto as Exhibit 1.

STEVEN A. TYRRELL
Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: October 15, 2007          By: _____

William B. Jacobson
Assistant Chief, Fraud Section
Criminal Division, U.S. Dept. of Justice
1400 New York Avenue, NW
Washington, D.C. 20005
(202) 514-7023

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | NO. 07-CR-00253 |
| | : | |
| v. | : | |
| | : | DEFERRED PROSECUTION |
| YORK INTERNATIONAL | : | AGREEMENT |
| CORPORATION, | : | |
| | : | |
| Defendant. | : | |

Defendant York International Corporation ("York" or "the Company"), a Delaware corporation, by its undersigned attorneys, pursuant to authority granted by its Board of Directors, and the United States Department of Justice, Criminal Division, Fraud Section ("this Office" or "the Department"), enter into this Deferred Prosecution Agreement ("the Agreement") which shall apply to York and all its affiliates and subsidiaries, including York Air Conditioning and Refrigeration ("YACR") (which was renamed on April 3, 2007, but will be referred to herein as "YACR") and York Air Conditioning and Refrigeration FZE ("FZE"). The terms and conditions of this Agreement are as follows:

1.    The United States will file a three-count criminal Information (attached hereto as Appendix A) in the United States District Court for the District of Columbia charging York with conspiracy to commit an offense against the United States, that is, to engage in wire fraud, in violation of 18 U.S.C. § 1343, and to falsify books and records of the Company, in violation of the books and records provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff(a), all in violation of 18 U.S.C. § 371.    The

Information will also charge one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of violating the FCPA's books and records provision, in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff(a). York knowingly waives its right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b). In addition, York knowingly waives any objection based on venue and consents to the filing of the Information and the Agreement in the United States District Court for the District of Columbia.

2.      York admits, accepts and acknowledges that it is responsible for the acts of its officers, employees and its wholly-owned subsidiaries, YACR and FZE, as set forth in the Information and the Statement of Facts attached as Appendix B to this Agreement (the "Statement of Facts"), and that the facts described therein are true and accurate. Should the Department initiate the prosecution that is deferred by this Agreement, York agrees that it will neither contest the admissibility of, nor contradict, in any such proceeding, the Statement of Facts.

3.      York further agrees to pay a monetary penalty of $10,000,000 to the U.S. Treasury within ten (10) days of the execution of this Agreement. This amount is a final payment and shall not be refunded (a) if the Department moves to dismiss the Information pursuant to this Agreement, or (b) should the Department later determine that York has breached this Agreement and brings a prosecution against it. Further, nothing in this Agreement shall be deemed an agreement by the Department that this amount is the maximum criminal fine that may be imposed in any such prosecution, and the Department shall not be precluded in such a

2

prosecution from arguing that the Court should impose a higher fine. The Department agrees, however, that in the event of a subsequent breach and prosecution, it will recommend to the Court that the amount paid pursuant to this Agreement should be offset against whatever fine the Court shall impose as part of its judgment. York acknowledges that no tax deduction may be sought in connection with the payment of this $10,000,000 penalty.

4.      The Department enters into this Agreement based upon the following facts: (a) York voluntarily and timely disclosed the misconduct described in the Information; (b) York conducted a thorough investigation of that misconduct and other possible misconduct; © York reported all of its findings to the Department; (d) York cooperated in the Department's investigation of this matter; (e) nearly all of the conduct described in the Information took place prior to York's acquisition by Johnson Controls, Inc. on December 9, 2005; (f) York has undertaken remedial measures to ensure that this conduct will not recur and has agreed to undertake further remedial measures as contemplated by this Agreement; (g) York has agreed to continue to cooperate with the Department in its ongoing investigation of the conduct of York, YACR, FZE and the officers, directors, employees and agents thereof; and (h) York has undertaken and agrees to complete a thorough review by an outside forensic accounting firm (the details of which previously have been disclosed to the Department) of legacy York operations designed to detect and remediate any weaknesses in the internal controls of the legacy York operations that may have led to or could lead to additional conduct similar to that described in the Statement of Facts.

5.      During the three-year term of this Agreement, York agrees to cooperate fully with the Department, and any other authority or agency, domestic or foreign, designated by the

3

Department investigating York, YACR, FZE or any of their present and former directors, officers, employees, agents, consultants, contractors and subcontractors, or any other party, in any and all matters relating to corrupt payments in connection with its operations. York agrees that its cooperation shall include, but is not limited to, the following:

a.    York shall continue to cooperate fully with the Department, and with all other authorities and agencies designated by the Department, and shall truthfully disclose all information with respect to the activities of York and its present and former subsidiaries and affiliates, and the directors, officers, employees, agents, consultants, contractors and subcontractors thereof, concerning all matters relating to corrupt payments in connection with their operations, related false books and records, and related inadequate internal controls about which York has any knowledge or about which the Department shall inquire. This obligation of truthful disclosure includes the obligation of York to provide to the Department, upon request, any document, record, or other tangible evidence relating to such corrupt payments, books and records, and internal controls about which the Department shall inquire of York.

I.    The Department specifically reserves the right to request that York provide the Department with access to information, documents, records, facilities and/or employees that may be subject to a claim of attorney-client privilege and/or the attorney work-product doctrine.

ii.    Upon written notice to the Department, York reserves the right to withhold access to information, documents, records, facilities and/or employees based upon an assertion of a valid claim of attorney-client privilege or application of the attorney work-product doctrine. Such notice shall include a general description of the nature of the information,

documents, records, facilities and/or employees that are being withheld, as well as the basis for the claim.

iii.    In the event that York withholds access to the information, documents, records, facilities and/or employees of York, the Department may consider this fact in determining whether York has fully cooperated with the Department.

iv.    Except as provided in this paragraph, York shall not withhold from the Department any information, documents, records, facilities and/or employees on the basis of an attorney-client privilege or work product claim.

b.    Upon request of the Department, with respect to any issue relevant to its investigation of corrupt payments in connection with the operations of York, or any of its former subsidiaries or affiliates, related books and records, and related inadequate internal controls, York shall designate knowledgeable employees, agents, or attorneys to provide to the Department the information and materials described in Paragraph 5(a) above, on behalf of York. It is further understood that York must at all times provide complete, truthful, and accurate information.

c.    With respect to any issue relevant to the Department's investigation of corrupt payments in connection with the operations of York, or any of its present or former subsidiaries or affiliates, York shall use its best efforts to make available for interviews or testimony, as requested by the Department, present or former directors, officers, employees, agents and consultants of York, or any of its present or former subsidiaries or affiliates, as well as the directors, officers, employees, agents and consultants of contractors and sub-contractors. This includes, but is not limited to, sworn testimony before a federal grand jury or in federal

5

trials, as well as interviews with federal law enforcement authorities. Cooperation under this paragraph will include identification of witnesses who, to the knowledge of York, may have material information regarding the matters under investigation.

       d.    With respect to any information, testimony, document, record, or other tangible evidence provided to the Department pursuant to this Agreement, York consents to any and all disclosures to other government agencies, whether agencies of the United States or a foreign government, of such materials as the Department, in its sole discretion, shall deem appropriate.

      6.    In return for the full and truthful cooperation of York, and compliance with all the terms and conditions of this Agreement, the Department agrees not to use any information related to the conduct described in the attached Information or any other conduct disclosed to the Department prior to the date of this Agreement, against Johnson Controls, Inc., York, or any of their present or former subsidiaries or affiliates, in any criminal or civil case, except in a prosecution for perjury or obstruction of justice; in a prosecution for making a false statement after the date of this Agreement; in a prosecution or other proceeding relating to any crime of violence; or in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. In addition, the Department agrees, except as provided herein, that it will not bring any criminal or civil case against Johnson Controls Inc., York, or any of their present or former subsidiaries or affiliates, related to the conduct of present and former employees as described in the attached Statement of Facts, or relating to information disclosed by York to the Department prior to the date of this Agreement. The Department understands that Johnson Controls, Inc., with the assistance of Ernst & Young LLP, is conducting, and will

6

continue to conduct, a review of selected business units within the legacy York operations as described in paragraph 4(h) above. The Department agrees that it will not bring charges against Johnson Controls, Inc., York, or any of their present or former subsidiaries or affiliates, for any conduct attributable to the legacy York operations that occurred before the date of this Agreement and that is discovered by Johnson Controls, Inc. or Ernst & Young LLP in the course of this review and is promptly disclosed to the Department and the Securities and Exchange Commission, provided that such conduct is similar in nature and order of magnitude, as determined by the Department in its sole, reasonable discretion, to the conduct disclosed to the Department prior to the date of this Agreement. With that limited exception, this paragraph does not provide any protection against prosecution for any corrupt payments made in the past which are not described in the attached Statement of Facts or were not disclosed to the Department prior to the date of this Agreement. This Paragraph also does not provide any protection against prosecution for any corrupt payments or false accounting, if any, made in the future by York, or any of its officers, directors, employees, agents or consultants, whether or not disclosed by York pursuant to the terms of this Agreement. In addition, this Paragraph does not provide any protection against criminal prosecution of any present or former officer, employee, director, shareholder, agent or consultant of York for any violations committed by them.

      7.     York represents that Johnson Controls, Inc. has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and all other applicable anti-corruption laws throughout the legacy York operations, including those of its subsidiaries, affiliates, joint ventures, and those of its contractors and subcontractors, with responsibilities that include interactions with foreign officials.

7

Implementation of these policies and procedures shall not be construed in any future enforcement proceeding as providing immunity or amnesty for any crimes not disclosed to the Department as of the date of the execution of this Agreement for which York would otherwise be responsible, except as provided in Paragraph 6 above.

8.    In order to address deficiencies in its internal controls, policies and procedures regarding compliance with the FCPA and other applicable anti-corruption laws, York agrees to conduct, in a manner consistent with all of its obligations under this Agreement, a review of the existing internal controls, policies and procedures within the legacy York operations. Moreover, where necessary and appropriate, Johnson Controls, Inc. will adopt new or modify existing internal controls, policies and procedures within the legacy York operations in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records and accounts; and (b) a rigorous anti-corruption compliance code designed to detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but ought not be limited to, the following elements:

a.    A compliance code with a clearly articulated corporate policy against violations of the FCPA and other applicable anti-corruption laws.

b.    A system of financial and accounting procedures, including a system of internal accounting controls, designed to ensure the maintenance of fair and accurate books, records and accounts.

c.    Promulgation of compliance standards and procedures designed to reduce the prospect of violations of the FCPA, other applicable anti-corruption laws and Johnson

8

Controls, Inc.'s compliance code. These standards and procedures should apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the legacy York operations in a foreign jurisdiction including agents, consultants, representatives, distributors, teaming partners, and joint venture partners (collectively referred to as "agents and business partners").

        d.      The assignment of responsibility to one or more senior corporate officials of Johnson Controls, Inc. for the implementation of and oversight of compliance with policies, standards and procedures regarding the FCPA and other applicable anti-corruption laws. Such corporate official(s) shall have the authority to report matters directly to Johnson Controls, Inc.'s Audit Committee of the Board of Directors.

        e.      Mechanisms designed to ensure that Johnson Controls, Inc.'s policies, standards and procedures regarding the FCPA and other applicable anti-corruption laws are effectively communicated to all directors, officers, employees and, where necessary and appropriate, agents and business partners of the legacy York operations. This should include: (1) periodic training for all such directors, officers, employees, agents and business partners; and (2) annual certifications by all such directors, officers, employees, agents and business partners, certifying compliance therewith.

        f.      An effective system for reporting suspected criminal conduct and/or violations of the compliance policies, standards, and procedures regarding the FCPA and other applicable anti-corruption laws for directors, officers, employees, agents and business partners.

        g.      Appropriate disciplinary procedures to address, among other things, violations of the FCPA, other applicable anti-corruption laws, and Johnson Controls, Inc.'s

compliance code, standards and procedures by directors, officers, and employees of the legacy York operations.

h.    Appropriate due diligence requirements pertaining to the retention and oversight of agents and business partners.

I.    Standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are designed to prevent violations of the FCPA and other applicable anti-corruption laws, which may, depending upon the circumstances, include: (1) anti-corruption representations and undertakings relating to compliance with the FCPA and other applicable anti-corruption laws; (2) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (3) rights to terminate an agent or business partner as a result of any breach of anti-corruption laws and regulations or representations and undertakings related to such matters.

9.    York agrees to engage an independent compliance monitor ("Monitor") within sixty (60) calendar days of the signing of this Agreement. For thirty (30) calendar days after the signing of this Agreement, the Company and the Department shall use mutual best efforts to identify a mutually acceptable person to serve as the Monitor. If, after that period, the parties have been unable to identify a mutually acceptable person then the Department in its sole discretion shall select a person to serve as the Monitor. The Monitor will, for a period of three (3) years from the date of this Agreement, evaluate, in the manner set forth in Paragraphs 10 through 16 below, the effectiveness within the legacy York operations of Johnson Controls, Inc.'s internal controls, record-keeping, and financial reporting policies and procedures as they relate to compliance with the books and records, internal accounting controls, and anti-bribery

10

provisions of the FCPA and other applicable anti-corruption laws. This review and evaluation shall include an assessment of those policies and procedures as actually implemented within the legacy York operations. The Monitor's assignment does not include an overall evaluation of Johnson Controls, Inc.'s internal controls, record-keeping, and financial reporting policies and procedures, although the Monitor may take reasonable steps to familiarize himself or herself with such controls to the extent reasonably necessary to review their effectiveness within the legacy York operations.

10.    York shall cooperate fully with the Monitor and the Monitor shall have the authority to take such reasonable steps, in his or her view, as may be necessary to be fully informed about Johnson Controls, Inc.'s compliance program as applied to the legacy York operations within the scope of his or her responsibilities under this Agreement. To that end, York shall provide the Monitor with access to all information, documents, records, facilities and/or employees that fall within the scope of responsibilities of the Monitor under this Agreement as set forth in Paragraph 9. Any such disclosure to the Monitor retained by York concerning corrupt payments, related books and records, and related internal controls, shall not relieve York of its obligation to truthfully disclose such matters to the Department.

a.    The parties agree that no attorney-client relationship shall be formed between York and the Monitor.

b.    In the event that York seeks to withhold from the Monitor access to information, documents, records, facilities and/or employees of York which may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, York shall promptly provide written notice of this determination to the Monitor and the Department. Such notice

11

shall include a general description of the nature of the information, documents, records, facilities and/or employees that are being withheld, as well as the basis for the claim. The Department may then consider whether to make a further request for access to such information, documents, records, facilities and/or employees, as provided in Paragraph 5(a) of this Agreement.

c.    Except as provided in this paragraph, York shall not withhold from the Monitor any information, documents, records, facilities and/or employees on the basis of an attorney client privilege or work product claim.

11.    York agrees that the Monitor shall assess: (1) whether Johnson Controls, Inc.'s compliance program as applied to the legacy York operations is reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws; (2) the integration of Johnson Controls, Inc.'s compliance program into the legacy York operations; and (3) the progress of the review of legacy York operations described in Paragraphs 4(h) and 6 above. During the three-year period, the Monitor shall conduct an initial review and prepare an initial report, followed by two (2) follow-up reviews and reports as described below. With respect to each of the three (3) reviews, after initial consultations with York and the Department, the Monitor shall prepare a written work plan for each of the reviews, which shall be submitted in advance to York and the Department for comment. In order to conduct an effective initial review and to fully understand any existing deficiencies in controls, policies and procedures related to the FCPA and other applicable anti-corruption laws, the Monitor's initial work plan shall include such steps as are reasonably necessary to develop an understanding of the facts and circumstances surrounding any violations that may have occurred, but it is not intended that the Monitor will conduct his or her own inquiry into those historical events. Any disputes between

12

York and the Monitor with respect to the work plan shall be decided by the Department in its sole discretion.

12.    In connection with the initial review, the Monitor shall issue a written report within one hundred twenty (120) calendar days of his or her retention setting forth the Monitor's assessment and making recommendations reasonably designed to improve the policies and procedures of Johnson Controls, Inc. as applied to the legacy York operations for ensuring compliance with the FCPA and other applicable anti-corruption laws. The Monitor shall provide the report to the Board of Directors of York and contemporaneously transmit copies to Mark F. Mendelsohn, (or his successor), Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, 10th and Constitution Ave., N.W., Bond Building, Fourth Floor, Washington, D.C. 20530. The Monitor may extend the time period for issuance of the report with prior written approval of the Department.

13.    Within one hundred and twenty (120) calendar days after receiving the Monitor's report, York shall adopt all recommendations in the report; provided, however, that within sixty (60) calendar days after receiving the report, York shall advise the Monitor and the Department in writing of any recommendations that York considers unduly burdensome, impractical, costly or otherwise inadvisable. With respect to any recommendation that York considers unduly burdensome, impractical, costly, or otherwise inadvisable, York need not adopt that recommendation within that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose. As to any recommendation on which York and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after York serves the written advice. In the event

York and the Monitor are unable to agree on an alternative proposal, York shall abide by the determination of the Monitor. With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred and twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Department.

14.     The Monitor shall undertake two (2) follow-up reviews to further monitor and assess whether the policies and procedures of Johnson Controls, Inc. as applied to the legacy York operations are reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws. Within one hundred and twenty (120) calendar days of initiating each follow-up review, the Monitor shall: (a) complete the review; (b) certify whether the anti-bribery compliance program of Johnson Controls, Inc., including its policies and procedures, is appropriately designed and implemented to ensure compliance with the FCPA and other applicable anti-corruption laws within the legacy York operations; and (c) report on the Monitor's findings in the same fashion as set forth in Paragraph 12 with respect to the initial review. The first follow-up review shall commence one year after appointment of the Monitor under this Agreement. The second follow-up review shall commence at least one year after completion of the first follow-up review. The Monitor may extend the time period for these follow-up reviews with prior written approval of the Department.

15.     In undertaking the assessments and reviews described in Paragraphs 11 through 14 of this Agreement, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including Johnson Controls, Inc.'s policies and procedures relating to anti-corruption compliance within the legacy York operations; (b) onsite observation

14

of the systems and procedures of the legacy York operations, including the legacy York operations internal controls and record keeping and internal audit procedures; (c) meetings with and interviews of relevant employees, officers, directors and other persons at mutually convenient times and places; and (d) analyses, studies and testing of Johnson Controls, Inc's anti-bribery compliance program as applied to the legacy York operations.

16.    Should the Monitor, during the course of his or her engagement, discover that questionable or corrupt payments or questionable or corrupt transfers of property or interests may have been offered, promised, paid, or authorized by any entity or person within the legacy York operations, or any entity or person working directly or indirectly for the legacy York operations, or that related false books and records have been maintained relating to the legacy York operations, the Monitor shall promptly report such payments to Johnson Controls, Inc.'s General Counsel, to its Audit Committee and to its outside counsel for further investigation, unless the Monitor believes, in the exercise of his or her discretion, that such disclosure should be made directly to the Department. If the Monitor refers the matter only to Johnson Controls, Inc.'s General Counsel, its Audit Committee, and its outside counsel, York shall promptly report the same to the Department. If York fails to make such disclosure within ten (10) calendar days of the report of such payments, the Monitor shall independently disclose his or her findings to the Department at the address listed above in Paragraph 12. Further, in the event that York, or any entity or person working directly or indirectly within the legacy York operations, refuses to provide information necessary for the performance of the Monitor's responsibilities, the Monitor shall disclose that fact to the Department. York and its shareholders shall not take any action to retaliate against the Monitor for any such disclosures or for any other reason. The Monitor may

15

report other criminal or regulatory violations discovered in the course of performing his or her duties, in the same manner as described above.

17.    In consideration of the actions of York and its parent company Johnson Controls, Inc. in voluntarily and timely disclosing the misconduct described in the attached Information, and conducting a thorough investigation by outside legal counsel regarding such misconduct and other matters disclosed to the Department; and the cooperation of York and Johnson Controls, Inc. with the investigation conducted by the Department; and the willingness of York to: (a) admit, accept and acknowledge responsibility for its behavior and that of its subsidiaries and affiliates; (b) continue its cooperation with the Department; © adopt and maintain remedial measures and independently review and audit such measures; and (d) complete a review of legacy York operations as described in Paragraphs 4 (h) and 6 above, the Department agrees that any prosecution of York for the conduct set forth in the Statement of Facts, and for the conduct related to information York disclosed to the Department prior to the date of this Agreement, be and hereby is deferred for a period of three (3) years from the date of this Agreement.

18.    The Department further agrees that if York fully complies with all of its obligations under this Agreement, including its obligation to adopt the recommendations of the Monitor in accordance with the terms of Paragraph 13, the Department will not continue the criminal prosecution against York described in Paragraph 1, will move to dismiss the Information, and, after three (3) years, this Agreement shall expire.

19.    If during the three-year term of this Agreement, the Department determines, in its sole discretion, that York has committed within the legacy York operations any federal crimes subsequent to the date of this Agreement, has provided deliberately false, incomplete, or

16

misleading information under this Agreement, or has otherwise breached the Agreement, York shall thereafter be subject to prosecution for any federal criminal violation of which the Department has knowledge. Any such prosecutions may be premised on information provided by York or Johnson Controls, Inc. Moreover, York agrees that any such prosecution that is not time-barred by the applicable statute of limitations on the date of this Agreement may be commenced against York in accordance with this Agreement, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the termination of this Agreement. By this Agreement, York expressly intends to and does waive any rights in this respect.

20.    It is further agreed that in the event that the Department determines that York has breached this Agreement: (a) all statements made by or on behalf of York to the Department or to the Court, including the attached Statement of Facts, and any testimony given by York before a grand jury or any tribunal, at any legislative hearings, or to the Securities and Exchange Commission ("SEC"), whether prior or subsequent to this Agreement, or any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Department against York; and (b) York shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of York prior or subsequent to this Agreement, and any leads derived therefrom, should be suppressed. The decision whether conduct or statements of any individual will be imputed to York for the purpose of determining whether York has violated any provision of this Agreement shall be in the sole discretion of the Department.

17

21.    York acknowledges that the Department has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if York breaches this Agreement and this matter proceeds to judgment.  York further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

22.    York agrees that in the event Johnson Controls, Inc. sells, merges, or transfers all or substantially all of the business operations of the legacy York operations as they exist as of the date of this Agreement, whether such sale is structured as a stock or asset sale, merger, or transfer, they shall include in any contract for sale, merger or transfer a provision binding the purchaser or any successor in interest thereto to the obligations described in this Agreement.

23.    York expressly agrees that it shall not, through present or future attorneys, Boards of Directors, officers, or any other person authorized to speak for York, including Johnson Controls, Inc., make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by York set forth above or the Statement of Facts.  Any such contradictory statement shall, subject to cure rights below by York, constitute a breach of this Agreement and York thereafter shall be subject to prosecution as set forth in Paragraphs 19 and 20 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to York for the purpose of determining whether they have breached this Agreement shall be at the sole discretion of the Department.  If the Department determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Department shall so notify York and York may avoid a breach of this Agreement by publicly repudiating

18

such statement(s) within five (5) business days after notification. Consistent with the obligations of York as set forth above, York shall be permitted to raise defenses and to assert affirmative claims in civil and regulatory proceedings relating to the matters set forth in the Statement of Facts. This Paragraph is not intended to apply to any statement made by any present or former employee of York in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of York.

24.    In connection with this Agreement, York shall only issue a press release if it first determines that the text of the release is acceptable to the Department.

25.    It is understood that this Agreement is binding on York and the Department but specifically does not bind any other federal agencies, or any state or local law enforcement or regulatory agencies, although the Department will bring the cooperation of York and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by York.

26.    This Agreement sets forth all the terms of the Deferred Prosecution Agreement between York and the Department. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Department, the attorneys for York, and a duly authorized representative of York.

27.    Any notice to York under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service or registered or certified mail, in each case addressed to Jerome D. Okarma, Vice President, Secretary and General Counsel, Johnson Controls, Inc., 5757 N. Green Bay Avenue, Milwaukee, Wisconsin, 53209. Notice shall be

19

effective upon actual receipt by York.

**AGREED:**

       **FOR YORK :**

                           Roger M. Witten
                           Wilmer Cutler Pickering Hale and Dorr LLP
                           Counsel for York International Corporation

                           Jerome D. Okarma
                           Vice President, Secretary, and General Counsel,
                           Johnson Controls, Inc.
                           Counsel to York International Corporation

       **FOR THE DEPARTMENT OF JUSTICE:**

                           STEVEN A. TYRRELL
                           Chief, Fraud Section

By:
                           Mark F. Mendelsohn
                           Deputy Chief, Fraud Section

By:
                           William B. Jacobson
                           Assistant Chief, Fraud Section

By:
                           Hank Walther
                           Trial Attorney, Fraud Section
                           United States Department of Justice
                           Fraud Section, Criminal Division
                           10th & Constitution Avenue, NW
                           Washington, D.C. 20530
                           (202) 514-7023

Filed at Washington, D.C., on this **1st** day of **Oct.**, 2007.

20

effective upon actual receipt by York.

**AGREED:**

       **FOR YORK :**

                              Roger M. Witten
                              Wilmer Cutler Pickering Hale and Dorr LLP
                              Counsel for York International Corporation

                              Jerome D. Okarma
                              Vice President, Secretary, and General Counsel,
                              Johnson Controls, Inc.
                              Counsel to York International Corporation

       **FOR THE DEPARTMENT OF JUSTICE:**

                              STEVEN A. TYRRELL
                              Chief, Fraud Section

            By:

                              Mark F. Mendelsohn
                              Deputy Chief, Fraud Section

            By:

                              William B. Jacobson
                              Assistant Chief, Fraud Section

            By:

                              Hank Walther
                              Trial Attorney, Fraud Section
                              United States Department of Justice
                              Fraud Section, Criminal Division
                              10th & Constitution Avenue, NW
                              Washington, D.C.  20530
                              (202) 514-7023

Filed at Washington, D.C., on this **1st** day of **Oct**, 2007.

20

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for York International Corporation ("York"). I understand the terms of this Agreement and voluntarily agree, on behalf of York, to each of its terms. Before signing this Agreement, I consulted with the attorney for York. The attorney fully advised me of York's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed this Agreement with the Board of Directors of York. I have advised and caused investigative and outside counsel for York to advise that Board fully of York's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of York, in any way to enter into this Agreement. I am also satisfied with the attorney's representation in this matter. I certify that I am an officer of York and that I have been duly authorized by York to execute this Agreement on behalf of York.

Date: _____          York International Corporation

                                     By: _____
                                     Stephen A. Roell
                                     Chairman and Chief Executive Officer
                                     York International Corporation

                                     Jerome D. Okarma
                                     Vice President
                                     York International Corporation

## CERTIFICATE OF COUNSEL

I am counsel for York International Corporation ("York") in the matter covered by this Agreement. In connection with such representation, I have examined relevant York documents and have discussed this Agreement with the Board of Directors of York. Based on my review of the foregoing materials and discussions, I am of the opinion that: York's representative has been duly authorized to enter into this Agreement on behalf of York. This Agreement has been duly and validly authorized, executed, and delivered on behalf of York and is a valid and binding obligation of York. Further, I have carefully reviewed this Agreement with the Board of Directors of York and General Counsel of Johnson Controls, Inc., as counsel to York. I have fully advised them of York's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. To my knowledge, York's decision to enter into this Agreement is an informed and voluntary one.

Date: September 28, 2007

Roger M. Witten
Wilmer Cutler Pickering Hale and Dorr LLP
Counsel for York International Corporation

ATTACHMENT A

**CERTIFICATE OF CORPORATE RESOLUTION**

WHEREAS, York International Corporation ("York" or "the company") has been engaged in discussions with the United States Department of Justice in connection with issues arising in relation to certain corrupt payments to the government of Iraq and to foreign officials in other countries to facilitate the award of contracts and obtaining business for the company; and

WHEREAS, in order to resolve such discussions, it is proposed that the company enter into a certain agreement with the United States Department of Justice; and

WHEREAS the General Counsel of Johnson Controls, Inc., as counsel to the company (hereinafter the "General Counsel"), together with investigative and outside counsel for the company, have advised the Board of Directors of York of the company's rights, possible defenses, the Organizational Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the United States Department of Justice;

Therefore, this Board hereby RESOLVES that:

1.      The company: (I) consents to the filing in the United States District Court for the District of Columbia of a three-count criminal Information charging York with conspiracy to commit an offense against the United States, that is to engage in wire fraud, in violation of 18 U.S.C. § 1343, and to falsify books and records of the company, in violation of the books and records provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff(a), all in violation of 18 U.S.C. § 371 (Count One), wire fraud, in violation of 18 U.S.C. § 1343 (Count Two), and one count of violating the FCPA's books and records provision, in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff(a) (Count Three); (ii) waives indictment on such charges and enters into a Deferred Prosecution Agreement with the United States Department of Justice; and (iii) agrees to pay a monetary penalty of $10,000,000 in accordance with the terms of the Deferred Prosecution Agreement.

2.      The General Counsel, or his delegate, is hereby authorized, empowered and directed, on behalf of the company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the General Counsel, or his delegate, may approve;

3.      The General Counsel, or his delegate, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions; and

4.   All of the actions of the General Counsel, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the company.

Date:_____

_____
Jerome D. Okarma
Secretary
Board of Directors
York International Corporation

2

## APPENDIX A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. _____ |
|  | : |  |
| Plaintiff, | : | VIOLATIONS:  18 U.S.C. § 371; |
|  | : | 18 U.S.C. § 1343; 15 U.S.C. §§ |
|  | : | 78m(b)(2)(A), 78m(b)(5), 78 ff(a); |
|  | : | 18 U.S.C. § 2. |
| v. | : |  |
|  | : |  |
| YORK INTERNATIONAL | : |  |
| CORPORATION, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

## INFORMATION

The United States Department of Justice, Criminal Division, Fraud Section, charges that:

### GENERAL ALLEGATIONS

1.     At all times material to this Information (unless specified otherwise):

York International Corporation Entities, Employees, and Agent

2.     YORK INTERNATIONAL CORPORATION ("YORK") was a global supplier of heating, ventilation, air-conditioning, and refrigeration equipment and services. YORK was headquartered in York, Pennsylvania, and maintained operations through subsidiaries in various foreign countries, including the United Arab Emirates ("UAE"), the Arab Republic of Egypt ("Egypt"), the Kingdom of Bahrain ("Bahrain"), the Republic of Turkey ("Turkey"), and the Republic of India ("India").

3.     YORK, a Delaware corporation, was publicly traded on the New York Stock Exchange.  It issued and maintained a class of publicly-traded securities registered pursuant to

Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), and was required to file

periodic reports with the United States Securities and Exchange Commission under Section 13 of

the Securities Exchange Act (15 U.S.C. § 78m). Accordingly, YORK was an "issuer" within the

meaning of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1(a). By virtue of its

status as an issuer within the meaning of the FCPA, YORK was required, pursuant to 15 U.S.C.

§ 78m(b)(2), to make and keep books, records and accounts which, in reasonable detail,

accurately and fairly reflected the transactions and disposition of assets of YORK and to ensure

that its wholly-owned subsidiaries maintained accurate books and records.

     4.     YORK maintained a wholly-owned subsidiary under the name of York Air

Conditioning and Refrigeration, Inc. ("YACR"), which was organized under the laws of the State

of Delaware and which maintained a branch office in Dubai, UAE. Accordingly, YACR was a

"domestic concern" within the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(1)(B). YACR's

Dubai office served as the headquarters of YORK's Middle East operations and employed the

YORK representatives who authorized and approved kickbacks to the government of Iraq.

     5.     YACR maintained a wholly-owned subsidiary under the name York Air

Conditioning and Refrigeration FZE ("FZE"), which was also headquartered in Dubai and was

the entity through which YORK conducted business in Iraq.

     6.     "Employee A," a citizen of the United Kingdom, was Vice President and General

Manager of YACR.

     7.     "Employee B," a citizen of the Syrian Arab Republic, was a Sales Manager of

YACR and was responsible for managing FZE's contracts with the Iraqi government.

8.     "Company X," a consulting company based in Jordan, was a sales agent for FZE in the Middle East region.

Overview of the Kickback and Bribery Schemes

9.     <u>FZE's Kickback Payments to the Iraqi Government</u>. From in or about November 2000 through March 2003, FZE paid approximately $647,000 in kickbacks to the government of the Republic of Iraq ("Iraq") in return for the award of Iraqi government contracts, administered through the United Nations Oil-for-Food Program ("OFFP"), with a total contract value of approximately $7 million. The kickbacks were authorized by Employees A and B, and were paid to the government of Iraq through Company X. FZE concealed the kickbacks from the U.N. by inflating its contract prices by 10% before submitting the contracts for approval. YORK and FZE also disguised the payments on their own corporate books and records by describing them as "commission" and "consultancy" payments.

10.     <u>YACR and FZE's Kickback and Bribe Payments in Other Countries</u>. From in or about September 1999 through December 2005, YACR and FZE, conspiring with others, known and unknown, authorized hundreds of kickbacks and bribes to employees of government customers and contractors of government customers in order to obtain approximately $42 million in contracts on governmental projects in Bahrain, Egypt, India, Turkey, and UAE. These kickbacks and bribes were primarily facilitated through contractors, who generated and submitted false invoices to YACR and FZE for consulting services that they had not performed. When YACR and FZE paid the contractors the fees for purported consulting services, the contractors gave cash back to YACR and FZE salespeople, who used the cash to pay the kickbacks and bribes.

3

Background: The United Nations Oil-for-Food Program

11.     On or about August 6, 1990, days after Iraq's invasion of Kuwait, the U.N.

adopted Security Council Resolution 661, which prohibited U.N. member-states from transacting

business with Iraq, except for the purchase and sale of humanitarian supplies.  Resolution 661

prohibited all direct financial transactions with the government of Iraq.

12.     On or about April 15, 1995, the U.N. adopted Security Council Resolution

986, which served as a limited exception to the Iraq sanctions regime in that it allowed Iraq to

sell its oil.  However,  Resolution 986 required that the proceeds of oil sales be used by the Iraqi

government to purchase humanitarian supplies, including food, for the Iraqi people.  Hence, this

program became known as the Oil for Food Program.  Payments made to the Iraqi government

which were not approved by the U.N., and which were outside the strict contours of the OFFP,

were prohibited.

13.     The OFFP required that the proceeds from all sales of Iraqi oil be deposited into a

U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-

Paribas").  That escrow account funded the purchase of humanitarian goods by the Iraqi

government.

14.     Under the provisions of the OFFP, a supplier of humanitarian goods contracted

with a ministry or other department of the Iraqi government to sell goods to the Iraqi government.

Once that contract was finalized, the contract was submitted to a U.N. Committee ("the 661

Committee") which reviewed the contracts  to ensure that their terms complied with all UN

OFFP and Iraqi sanction regulations.  The 661 Committee accepted the contracts, rejected them,

4

or asked the supplier to provide additional information upon which the committee could make a decision.

15.     If a contract was approved by the 661 Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were determined by the OFFP to have been met, the OFFP would direct BNP-Paribas to release payment to the supplier.

16.     On or about December 10, 1996, the first Iraqi oil exports under the U.N. OFFP began. The OFFP continued from in or about December 1996 until the United States' invasion of Iraq on or about March 19, 2003. From in or about December 1996 through March 2003, the United States government prohibited United States companies and individuals from engaging in transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the OFFP. 31 C.F.R. § 575.201, *et. seq.*

17.     Beginning in approximately August 2000, the Iraqi government demanded that the suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government. These kickbacks violated U.N. OFFP regulations and U.N. sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by OFFP guidelines.

18.     Often  these kickbacks were termed "after sales service fees" ("ASSFs"). They did not, however, involve the performance of any actual service by the supplier. These ASSFs

5

were usually included in the contract price submitted by the supplier to the U.N. without

disclosing to the U.N. the fact that the contract contained an extra 10% which would be kicked

back to the Iraqi government. Including the 10% in the contract price allowed the supplier to

avoid paying the 10% out of its profits; instead, the suppliers caused the UN to fund the

kickbacks to the Iraqi government.

19.     Some suppliers labeled the ASSFs as such in the contracts submitted to the U.N.

for approval, thereby leading the U.N. to believe that actual after-sales services were being

provided by the supplier. Other suppliers disguised the ASSFs by inserting fictitious line items

into the contracts for goods or services that were not being provided. Still other suppliers simply

inflated their contract prices by 10% to account for the payments they would make, or cause to be

made, to the Iraqi government.

## COUNT ONE
**(Conspiracy)**

### THE CONSPIRACY AND ITS OBJECTS

20.     Paragraphs 1 through 19 of this Information are realleged and incorporated

by reference as if set out in full.

21.     From in or about September 1999 through December 2005, within the territory of

the United States and elsewhere, defendant YORK, and others, known and unknown, did

unlawfully and knowingly combine, conspire, confederate and agree together and with each other

to commit the following offenses against the United States:

a.     to knowingly devise, and intend to devise a scheme and artifice to defraud

the United Nations and the Oil-for-Food Program and to obtain money and property by means of

6

materially false and fraudulent pretenses, representations and promises, through the use of

interstate and foreign wire communications, in violation of 18 U.S.C. § 1343; and

        b.     to knowingly falsify and cause to be falsified books, records, and accounts

which, in reasonable detail, would accurately and fairly reflect the transactions and dispositions

of the assets of YORK, an issuer within the meaning of the FCPA, in violation of 15 U.S.C. §§

78m(b)(2)(A), 78m(b)(5) and 78ff(a).

PURPOSE OF THE CONSPIRACY

     22.    The primary purpose of the conspiracy was to pay unlawful kickbacks to the Iraqi

government and to make other improper payments to officials of other governments in order to

assist in obtaining and retaining business from and with those governments.

MANNER AND MEANS OF THE CONSPIRACY

     23.    To achieve the purpose of the conspiracy, YORK, through its wholly-owned

subsidiaries FZE and YACR, and others, used the following manner and means, among others:

        a.     It was part of the conspiracy that FZE agreed to cause money to be sent

to bank accounts controlled by the government of Iraq in exchange for being granted contracts

with the government.

        b.     It was a further part of the conspiracy that FZE inflated by 10% the prices

of contracts submitted to the U.N. for approval under the OFFP, without notifying the U.N. of

this price inflation,  in order to generate the money that would be paid to the government of Iraq

and to conceal from the U.N. the fact that money would be paid to the government of Iraq.

        c.     It was a further part of the conspiracy that FZE caused the transmission of

international wire communications to advise the U.N. OFFP that FZE goods had been shipped to,

7

and inspected in, Iraq, and to transmit notice to FZE's bank in Dubai that the U.N. was authorizing payments pursuant to the contracts.

        d.    It was a further part of the conspiracy that YACR and FZE authorized the making of improper payments to government officials in UAE, Egypt, Bahrain, Turkey, and India, in order to assist in obtaining and retaining business on government projects in those countries.

        e.    It was a further part of the conspiracy that YACR and FZE hired third-party consultants and agents for the purpose of facilitating and concealing the kickbacks and bribes.

        f.    If was a further part of the conspiracy that YORK falsely described the kickbacks paid to the Iraqi government and to government officials in Bahrain, Egypt, India, Turkey, and UAE in its corporate books and records, terming the payments "commission" and "consultancy" payments, when in truth and in fact, the payments generated cash which was used to pay bribes and kickbacks to foreign governments and officials.

## OVERT ACTS

24.    In furtherance of the conspiracy and to accomplish its unlawful objects, the following overt acts, among others, were committed within the territory of the United States and elsewhere:

### OFFP Kickbacks to the Iraqi Government

25.    In or about March 1999, FZE retained Company X for the purpose of obtaining contracts with the government of Iraq, pursuant to the OFFP.

26.    On or about November 1, 2000, FZE submitted a bid to supply air compressors to the Iraqi Ministry of Trade and was told by an Iraqi ministry official that in order to obtain the contract, FZE must pay a kickback to the Iraqi government in the amount of 10% of the total contract price.

27.    On or about November 19, 2000, Employees A and B met with a representative of Company X to discuss FZE's bid to obtain the Iraqi compressor contract, and agreed to pay the requested kickback to the Iraqi government by inflating the amount of money paid to Company X by the amount of the requested kickback, and then having Company X pay that additional amount into bank accounts controlled by the Iraqi government.

28.    On or about November 29, 2000, FZE was awarded a contract to supply air compressors to the Iraqi Ministry of Trade, with a total contract price of $1,236,379. This contract, which was referenced by the U.N. as Contract H_801559, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

29.    On or about November 29, 2000, at FZE's direction, Company X paid a kickback of approximately $109,911 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_801559.

30.    On or about February 27, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 1,328,736 Euros from the OFFP

escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract H_801559.

31.    On or about December 21, 2000, FZE was awarded a contract to supply spare parts to the Iraqi Ministry of Health, with a total contract price of $1,669,457. This contract, which was referenced by the U.N. as Contract H_801608, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

32.    On or about December 21, 2000, at FZE's direction, Company X paid a kickback of approximately $146,267 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_801608.

33.    On or about October 17, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 1,816,369 Euros from the OFFP escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract H_801608.

34.    On or about May 15, 2001, FZE was awarded a contract to supply air conditioners to the Iraqi Ministry of Trade, with a total contract price of $464,488. This contract, which was referenced by the U.N. as Contract H_900834, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

10

35.     On or about May 15, 2001, at FZE's direction, Company X paid a kickback of approximately $32,482 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_900834.

36.     On or about October 11, 2002, the New York branch of BNP-Paribas sent, via an international electronic wire communication a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 530,690.36 Euros from the OFFP escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract H_900834.

37.     On or about May 19, 2001, FZE was awarded a contract to supply spare parts to the Iraqi Ministry of Transport and Communications, with a total contract price of $231,522. This contract, which was referenced by the U.N. as Contract H_900835, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

38.     On or about May 19, 2001, Company X paid a kickback of approximately $22,277 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_900835.

39.     On or about September 27, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 270,186 Euros from the OFFP escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract H_900835.

11

40.    On or about May 30, 2001, FZE was awarded a contract to supply air-cooled package units to the Iraqi Ministry of Transport and Communications, with a total contract price of $40,279. This contract, which was referenced by the U.N. as Contract H_901296, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

41.    On or about May 30, 2001, at FZE's direction, Company X paid a kickback of approximately $3,923 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_901296.

42.    On or about May 23, 2002, a company based in Geneva, Switzerland that provided commercial inspection services on behalf of the U.N. in Iraq ("the inspection company"), sent from Iraq to the U.N. in New York, via international wire communication, verification that YORK products purchased pursuant to Contract H_901296 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to YORK for Contract H_901296.

43.    On or about July 24, 2001, FZE was awarded a contract to supply air conditioners and spare parts to the Iraqi Ministry of Higher Education and Scientific Research, with a total contract price of $3,232,323. This contract, which was referenced by the U.N. as Contract H_1100131, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in YORK's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

12

44.     On or about July 24, 2001, at FZE's direction, Company X paid a kickback of $332,250 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_1100131.

45.     On or about November 1, December 1, December 7 and December 8, 2002, the inspection company sent from Iraq to the U.N. in New York, via international wire communications, verification that YORK products purchased pursuant to Contract H_1100131 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to YORK for Contract H_1100131.

46.     In order to conceal the kickback payments to the Iraqi government on its corporate books and records, YORK and FZE improperly characterized the payments to the Iraqi government as "commission" and "consultancy" payments to Company X.

### Other Improper Payments

47.     From in or about September 1999 through December 2005, YACR and FZE authorized hundreds of improper payments to employees of government customers and contractors of government customers in order to assist in obtaining and retaining business on government projects in Bahrain, Egypt, India, Turkey and UAE. These kickbacks and bribes were primarily facilitated through contractors, who generated and submitted false invoices to YACR and FZE for consulting services that they had not performed. When YACR and FZE paid the fees for the purported consulting services, the contractors gave cash to YACR and FZE salespeople, who used the cash to pay the kickbacks and bribes.

48.     In one case, YACR authorized the payment of kickbacks in connection with its work for a luxury hotel and convention complex in Abu Dhabi, UAE, as follows:

13

       a.     In or about 2003 and 2004, YACR was awarded several contracts worth a total of approximately $3.7 million to supply air conditioning goods and services for a luxury hotel and convention complex built and owned by the government of Abu Dhabi, UAE. In exchange for its receipt of the hotel and convention complex contracts, from in or about March 2003 through April 2004, YACR, through Employee B, made thirteen payments totaling approximately $550,000 to an intermediary in circumstances that make it likely that the intermediary made corrupt payments to members of the hotel and convention complex's executive committee, which was established by UAE government decree and which represented UAE's Ministry of Finance and Industry in managing the construction of the complex.

       (All in violation of Title 18, United States Code, Section 371).

### COUNT TWO
### (Wire Fraud)

49.     Paragraphs 1 though 19 and 25 through 47 are realleged and incorporated as if fully set forth herein.

50.     From approximately November 2000 through March 2003, within the territory of the United States and elsewhere, defendant YORK, acting through its wholly-owned subsidiary FZE, unlawfully, willfully and knowingly having devised a scheme and artifice to defraud and obtain money from the U.N. and the OFFP by means of false and fraudulent pretenses, representations and promises, caused the transmission of writings, signs and signals, by means of wire communication in interstate and foreign commerce, for the purpose of executing such scheme and artifice, to wit:

14

a.      FZE caused international wire communications to be transmitted by BNP Paribas in New York, New York, to ABN Amro Bank N.V. located in Dubai, UAE, thereby authorizing the eventual payment by the U.N. to YORK for humanitarian goods supplied to the Iraqi government; and

b.      FZE caused international wire communications to be transmitted by an inspection company in Iraq to the U.N. in New York, New York, informing the U.N. that humanitarian goods supplied by FZE had been received and inspected by the inspection company in Iraq, thereby triggering payment for those goods to FZE by the U.N. OFFP.

(All in violation of Title 18, United States Code, Sections 1343 and 2).

### COUNT THREE
### (Books and Records)

51.     Paragraphs 1 through 19 and 25 through 47 are realleged and incorporated as if fully set forth herein.

52.     Defendant YORK, by virtue of its status as an "issuer" within the meaning of the Securities and Exchange Act of 1934, was required to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets of YORK.

53.     From in our about September 1999 through in or about December 2005, within the territory of the United States and elsewhere, defendant YORK knowingly falsified the books, records and accounts it was required to maintain under the Securities and Exchange Act of 1934 in that:

15

a.       YORK inaccurately reflected in its books and records the payments to

Company X as "commission" and "consultancy" payments when in fact, as YORK understood, a

portion of those payments were unlawful kickbacks to the Iraqi government, paid through

Company X;  and

b.       YORK inaccurately reflected in its books and records the payments in

Bahrain, Egypt, India, Turkey, and UAE as "commission" and "consultancy" payments when, in

fact, as YORK understood, those payments were used to generate cash which was used to pay

kickbacks and bribes.

(All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff(a)
and Title 18, United States Code, Section 2).

STEVEN A. TYRRELL
Chief, Fraud Section
Criminal Division
United States Department of Justice

By:

Mark F. Mendelsohn
Deputy Chief, Fraud Section

William B. Jacobson
Robertson Park
Assistant Chiefs, Fraud Section

Hank Bond Walther
Trial Attorney, Fraud Section

16

**APPENDIX B**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Agreement

between the United States Department of Justice, Criminal Division, Fraud Section, and York

International Corporation and its subsidiaries and affiliates, including York Air Conditioning and

Refrigeration, Inc. (which was renamed on April 3, 2007 but will be referred to herein as

"YACR") and York Air Conditioning and Refrigeration FZE ("FZE"):

I.     **Relevant Parties**

1.     At all times relevant to the facts described herein, York International Corporation

("York") was a Delaware corporation, with its headquarters in York, Pennsylvania. York was

publicly traded on the New York Stock Exchange, and was an "issuer" within the meaning of the

Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1(a), until it was acquired by

Johnson Controls, Inc. on December 9, 2005. York was a global supplier of heating, ventilation,

air-conditioning, and refrigeration equipment and services. In addition to its United States

operations, York maintained operations through subsidiaries in various foreign countries,

including the Kingdom of Bahrain ("Bahrain"), the Arab Republic of Egypt ("Egypt"), the

Republic of India ("India"),  the Republic of Turkey ("Turkey"), and the United Arab Emirates

("UAE").

2.     At all times relevant to the facts described herein, York maintained a wholly-

owned subsidiary under the name of YACR, which was organized under the laws of the State of

Delaware and which maintained a branch office in Dubai, UAE. Accordingly, YACR was a

"domestic concern" within the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(1)(B). YACR's

Dubai office served as the headquarters of York's Middle East operations and employed the York

representatives who authorized and approved kickbacks to the government of Iraq described below.

3.    YACR maintained a wholly-owned subsidiary under the name FZE, which was also headquartered in Dubai and was the entity through which York conducted business in Iraq.

4.    "Employee A," a citizen of the United Kingdom, was Vice President and General Manager of YACR.

5.    "Employee B," a citizen of the Syrian Arab Republic, was a Sales Manager of YACR and was responsible for managing FZE's contracts with the Iraqi government described below.

6.    "Company X," a consulting company based in Jordan, was a sales agent for FZE in the Middle East region. Company X was also the primary intermediary between FZE and the government of Iraq and was the entity used to facilitate kickbacks paid from FZE to the government of Iraq described below.

## II.    Overview of the Kickback and Bribery Schemes

7.    From November 2000 through March 2003, York paid approximately $647,000 in kickbacks to the government of the Republic of Iraq ("Iraq"), in return for York's receipt of approximately $7 million in Iraqi government contracts, all of which were administered through the United Nations Oil-for-Food Program ("OFFP"). Additionally, from September 1999 through December 2005, YACR and FZE paid kickbacks and bribes to employees of government customers and contractors of government customers in order to obtain and retain approximately $42 million in contracts on government projects in UAE, Egypt, Bahrain, Turkey, and India.

2

III.    **The United Nations Oil For Food Program**

8.     On or about August 6, 1990, days after Iraq's invasion of Kuwait, the U.N. adopted Security Council Resolution 661, which prohibited U.N. member-states from transacting business with Iraq, except for the purchase and sale of humanitarian supplies.  Resolution 661 prohibited all direct financial transactions with the government of Iraq.

9.     On or about April 15, 1995, the U.N. adopted Security Council Resolution 986, which served as a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its oil.  However,  Resolution 986 required the proceeds from oil sales to be used by the Iraqi government to purchase humanitarian supplies, including food, for the Iraqi people.  Hence, this program became known as the Oil for Food Program.  Payments made to the Iraqi government which were not approved by the U.N., and which were outside the strict contours of the OFFP, were still prohibited.

10.     The OFFP required that the proceeds of all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas").  That escrow account funded the purchase of humanitarian goods by the Iraqi government.

11.     Under the provisions of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the Iraqi government. Once that contract was finalized, the contract was submitted to a U.N. Committee ("the 661 Committee") which reviewed the contracts to ensure that their terms complied with all U.N. OFFP and Iraqi sanction regulations.  The 661 Committee accepted the contracts, rejected them, or asked the supplier to provide additional information upon which the committee could make a

3

decision.

12.     If a contract was approved by the 661 Committee, a letter of credit was issued by

the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be

paid by the OFFP for the relevant goods once certain conditions were met, including delivery of

the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were

determined by the OFFP to have been met, the OFFP would direct BNP-Paribas to release

payment to the supplier.

13.     On or about December 10, 1996, the first Iraqi oil exports under the U.N. OFFP

began. The OFFP continued from in or about December 1996 until the United States' invasion

of Iraq on or about March 19, 2003. From in or about December 1996 through March 2003, the

United States government prohibited United States companies and individuals from engaging in

transactions with the government of Iraq, unless such transactions were authorized by the U.N.

pursuant to the OFFP. 31 C.F.R. § 575.201, et. seq.

14.     Beginning in approximately August 2000, the Iraqi government demanded that

the suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price,

to the Iraqi government in order to be awarded a contract by the government. These kickbacks

violated U.N. OFFP regulations and U.N. sanctions which prohibited payments to the Iraqi

government which were not expressly approved by the U.N. and which were not contemplated by

OFFP guidelines.

15.     Often these kickbacks were termed "after sales service fees" ("ASSFs"). They did

not, however, involve the performance of any actual service by the supplier. These ASSFs were

usually included in the contract price submitted by the supplier to the U.N. without disclosing the

4

fact that the contract contained an extra 10% which would be kicked back to the Iraqi

government. Including the 10% in the contract price allowed the supplier to avoid paying the

10% out of its profits; instead, the suppliers caused the U.N. to fund the kickbacks to the Iraqi

government.

16.    Some suppliers labeled the ASSFs as such in the contracts submitted to the U.N.

for approval, thereby leading the U.N. to believe that actual after-sales services were being

provided by the supplier. Other suppliers disguised the ASSFs by inserting fictitious line items

into the contracts for goods or services that were not being provided. Still other suppliers simply

inflated their contract prices by 10% to account for the payments they would make, or cause to be

made, to the Iraqi government.

## IV.    FZE's Kickback Payments to the Iraqi Government

17.    As set forth in greater detail below, from in or about November 2000 through

March 2003, FZE paid approximately $647,000 in kickbacks to the government of Iraq in return

for the award of Iraqi government contracts, administered through the OFFP, with a total contract

value of approximately $7 million. The kickbacks were authorized by Employees A and B, and

were paid to the government of Iraq through Company X. FZE concealed the kickbacks from the

U.N. by inflating its contract prices by 10% before submitting the contracts for approval to the

661 Committee. York and FZE also disguised the payments on their own corporate books and

records by describing them as "commission" and "consultancy" payments.

18.    In or about March 1999, FZE retained Company X for the purpose of

obtaining contracts with the government of Iraq, pursuant to the OFFP.

5

19.     On or about November 1, 2000, FZE submitted a bid to supply air compressors to the Iraqi Ministry of Trade and was told by an Iraqi ministry official that in order to obtain the contract, FZE must pay a kickback to the Iraqi government in the amount of 10% of the total contract price.

20.     On or about November 19, 2000, Employees A and B met with a representative of Company X to discuss FZE's bid to obtain the Iraqi compressor contract, and agreed to pay the requested kickback to the Iraqi government by inflating the amount of money paid to Company X by the amount of the requested kickback, and then having Company X pay that additional amount into bank accounts controlled by the Iraqi government.

21.     On or about November 29, 2000, FZE was awarded a contract to supply air compressors to the Iraqi Ministry of Trade, with a total contract price of $1,236,379. This contract, which was referenced by the U.N. as Contract H_801559, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in York's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

22.     On or about November 29, 2000, at FZE's direction, Company X paid a kickback of approximately $109,911 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_801559.

23.     On or about February 27, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 1,328,736 Euros from the OFFP escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract

6

H_801559.

24.    On or about December 21, 2000, FZE was awarded a contract to supply spare parts to the Iraqi Ministry of Health, with a total contract price of $1,669,457. This contract, which was referenced by the U.N. as Contract H_801608, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in York's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

25.    On or about December 21, 2000, at FZE's direction, Company X paid a kickback of approximately $146,267 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_801608.

26.    On or about October 17, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 1,328,736 Euros from the OFFP escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract H_801608.

27.    On or about May 15, 2001, FZE was awarded a contract to supply air conditioners to the Iraqi Ministry of Trade, with a total contract price of $464,488. This contract, which was referenced by the U.N. as Contract H_900834, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in York's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

7

28.     On or about May 15, 2001, at FZE's direction, Company X paid a kickback of approximately $32,482 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_900834.

29.     On or about October 11, 2002, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 530,609.36 Euros from the OFFP escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract H_900834.

30.     On or about May 19, 2001, FZE was awarded a contract to supply spare parts to the Iraqi Ministry of Transport and Communications, with a total contract price of $231,522. This contract, which was referenced by the U.N. as Contract H_900835, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in York's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

31.     On or about May 19, 2001, Company X paid a kickback of approximately $22,277 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_900835.

32.     On or about September 27, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to ABN Amro Bank N.V., located in Dubai, UAE, authorizing the eventual payment of 270,186.00 Euros from the OFFP escrow fund maintained at BNP-Paribas to FZE, which represented payment for Contract H_900835.

8

33.    On or about May 30, 2001, FZE was awarded a contract to supply air-cooled package units to the Iraqi Ministry of Transport and Communications, with a total contract price of $40,279. This contract, which was referenced by the U.N. as Contract H_901296, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in York's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

34.    On or about May 30, 2001, at FZE's direction, Company X paid a kickback of approximately $3,923 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_901296.

35.    On or about May 23, 2002, a company based in Geneva, Switzerland that provided commercial inspection services on behalf of the U.N. in Iraq ("the inspection company"), sent from Iraq to the U.N. in New York, via international wire communication, verification that York products purchased pursuant to Contract H_901296 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to York for Contract H_901296.

36.    On or about July 24, 2001, FZE was awarded a contract to supply air conditioners and spare parts to the Iraqi Ministry of Higher Education and Scientific Research, with a total contract price of $3,232,323. This contract, which was referenced by the U.N. as Contract H_1100131, was awarded based on a bid that included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in York's and FZE's books and records and was intended to be used to pay a kickback to the Iraqi government, through Company X.

9

37.    On or about July 24, 2001, at FZE's direction, Company X paid a kickback of $332,250 into a bank account controlled by the Iraqi government, which amounted to approximately 10% of the price of Contract H_1100131.

38.    On or about November 1, December 1, December 7 and December 8, 2002, the inspection company sent from Iraq to the U.N. in New York, via international wire communications, verification that York products purchased pursuant to Contract H_1100131 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to York for Contract H_1100131.

39.    In order to conceal the kickback payments to the Iraqi government on its corporate books and records, York and FZE improperly characterized the payments to the Iraqi government as "commission" and "consultancy" payments to Company X, when in fact, as York understood, those payments were unlawful kickbacks to the Iraqi government, paid through Company X.

V.    **YACR and FZE's Kickback and Bribe Payments in Other Countries**

40.    From September 1999 through December 2005, YACR and FZE representatives authorized hundreds of kickbacks and bribes to employees of government customers and contractors of government customers in order to obtain and retain business on government projects in Bahrain, Egypt, India, Turkey, and UAE. These kickbacks and bribes were primarily facilitated through YACR's and FZE's own contractors, who generated and submitted false invoices to YACR and FZE for consulting services that they had not performed. When YACR and FZE paid the contractors the fees for purported consulting services, the contractors gave cash back to YACR and FZE salespeople, who used the cash to pay the kickbacks and bribes.

41.    For example, YACR authorized the payment of kickbacks in connection with its

10

work for a luxury hotel and convention complex in Abu Dhabi, UAE. Specifically, in or about

2003 and 2004, YACR was awarded several contracts worth a total of approximately $3.7

million to supply air conditioning goods and services for the luxury hotel and convention

complex built and owned by the government of Abu Dhabi, UAE. In exchange for its receipt of

the hotel and convention complex contracts, YACR, through Employee B, made thirteen

payments totaling approximately $550,000 to an intermediary in circumstances that make it

likely that the intermediary made corrupt payments to members of the hotel and convention

complex's executive committee, which was established by UAE government decree and which

represented UAE's Ministry of Finance and Industry in managing the construction of the

complex.

     42.     York inaccurately reflected in its books and records the payments in Bahrain,

Egypt, India, Turkey, and UAE as "commission" and "consultancy" payments when, in fact, as

York understood, those payments were used to generate cash, a portion of which was used to pay

kickbacks and bribes.

11